IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:14-cr-230-AJT |
| MUNA OSMAN JAMA and | ) | |
| HINDA OSMAN DHIRANE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND FINDINGS OF FACT
## IN SUPPORT OF VERDICT

On October 25, 2016, the Court found Defendant Muna Osman Jama ("Jama") guilty on Counts One through Twenty-One of the superseding indictment and Defendant Hinda Osman Dhirane ("Dhirane") guilty on Counts One and Sixteen through Twenty-One and not guilty on Counts Two through Fifteen of the superseding indictment. The Court's verdict followed the presentation of evidence during a nonjury trial held on July 14-18, 2016, supplemental briefing on defendants' Rule 29 motion for a judgment of acquittal, and closing arguments on October 12, 2016. Immediately before the Court returned its verdict, Defendant Jama made an oral motion on October 25, 2016 pursuant to Federal Rule of Criminal Procedure 23(c) requesting that the Court state its specific findings of fact.[1] In response to Jama's request, the Court stated its specific findings of fact in open court at the time it issued its verdict and denied Defendants' Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29. The Court now issues this memorandum opinion and written findings of fact in further support of its verdict and its denial of Defendants' Rule 29 motion.

---

[1] Rule 23(c) provides that in a nonjury trial, "[i]f a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." Fed. R. Civ. P. 23(c).

# I. BACKGROUND

## A.    Procedural History

On June 26, 2014, a grand jury returned a twenty-one count superseding indictment

against Defendants Jama and Dhirani, together with Codefendant Farhia Hassan ("Hassan"), who

was arrested in the Netherlands and remains outside of the United States, and two other

Codefendants, Fardowsa Jama Mohamed ("Mohamed") and Barira Hassan Abdullahi

("Abdullahi"), who have not been arrested and appear to be located outside of the United States.

In Count One, Defendants are charged with Conspiracy to Provide Material Support to a Foreign

Terrorist Organization, namely Harakat al-Shabaab al-Mujahideenal-Shabaab ("al-Shabaab" or

"AS"), in violation of 18 U.S.C. § 2339B ("Section 2339B").  In Counts Two through Twenty-

One, they are charged with Providing Material Support to a Foreign Terrorist Organization in

violation of 18 U.S.C. §§ 2 & 2339B.

Defendants waived trial by jury, and the Court held a bench trial beginning on July 11,

2016.  On July 14, 2016, after the United States rested its case in chief, Defendant Jama moved

for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  [Doc. No. 232.]

The Court reserved decision on the motion.[2]  Thereafter, the parties continued the presentation of

evidence, with all parties resting on July 18, 2016, following which point Defendant Jama

renewed her Rule 29 Motion.[3]  The Court then ordered the filing of supplemental briefing and

---

[2] Also on July 14, 2016, Defendant Jama filed a Motion to Exclude Specified Exhibits [Doc. No. 233] on the grounds that statements made by persons identified as anyone other than Defendants Jama and Dhirane or whose identity is unclear should be barred because they (1) lack the necessary foundation, (2) are hearsay, and/or (3) do not show intent or state of mind.  The Court reserved decision on that objection pending the complete presentation of the government's evidence.  On October 25, 2016, the Court overruled those objections in open court on the grounds that there was a sufficient foundation to admit the challenged evidence, the evidence was relevant under Rules 401 and not excludable under Rule 403, and the challenged statements were not hearsay either under Rule 801(d)(2)(A) or (E) or as verbal facts probative of knowledge, intent, motive, plan, preparation, or absence of mistake.
[3] On September 9, 2016, Dhirane filed a Motion to Adopt and Join the Rule 29 motion and a memorandum in support of that motion.  [Doc. No. 248.]  The Court granted Defendant Dhirane's motion on October 25, 2016 in open court.

continued closing arguments to October 12, 2016.[4]  After closing arguments, the Court again reserved decision on Defendants' pending Rule 29 motion.

### B.    Superseding Indictment

Count One of the superseding indictment alleges that "[f]rom at least in or about February 2011" and continuing through the date of the superseding indictment, Jama and Dhirane, together with Codefendants Mohamed, Hassan, and Abdullahi, conspired with each other and with others "knowingly to provide material support and resources to a foreign terrorist organization, that is, al-Shabaab," in violation of 18 U.S.C. § 2339B.  The superseding indictment further alleges that in furtherance of the conspiracy, Jama and Dhirane and their co-conspirators engaged in a series of twenty-six transfers of funds, beginning on February 8, 2011 with a transfer from Jama to Mohamed and ending on January 23, 2013 with a transfer from Dhirane to Daahir Abdi.

Counts Two through Twenty-One of the superseding indictment allege that on specific dates, a defendant or co-conspirator transmitted or attempted to transmit a particular amount of money to a particular individual, thereby providing material support or resources to al-Shabaab in violation of 18 U.S.C. § 2339B.  These counts are stated chronologically, beginning with an alleged transfer from Defendant Jama to Mohamed on February 8, 2011 (Count Two) and ending with an alleged transfer from Defendant Jama to Osman Jama, her father, on August 8, 2012 (Count Twenty-One).  Fourteen of the twenty counts of material support involve transfers from Jama to Mohamed; four involve transfers from Ali B. Sheik, Jama's husband, to Mohamed; and two involve transfers from Jama to Osman Jama.

---

[4] Before the closing arguments, the United States filed a pleading styled a "Motion for a Verdict Before Ruling on Defendants' Untested Legal Theories in Their Closing Arguments or on Defendants' Rule 29 Motion Based Upon the Geneva Conventions." [Doc. No. 258.]  The Court denies that motion as moot.

At the time the events in this case took place, Title 18 of the United States Code, Section 2339B(a)(1) provided that:

> [w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activities (as defined in section 212 (a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the For Relations Authorization, Fiscal Years 1988 and 1989).[6]

"Material support or resources" is defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials . . . .

18 U.S.C § 2339A(b)(1).

In order to convict a particular defendant of conspiracy to provide material support to a foreign terrorist organization, as alleged in Count One, the United States must prove beyond a reasonable doubt the following elements: (1) two or more persons entered into an agreement that had as its objective providing material support or resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B; (2) the defendant knew that the objective of the agreement or the means by which it was to be accomplished was unlawful; and (3) the defendant knowingly and voluntarily became a part of that agreement. *See U.S. v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ("The Court has repeatedly said that the essence of a conspiracy is "an agreement to commit an unlawful act."") (quoting *Iannelli v. United States*, 420 U.S. 770, 777 (1975)); *U.S. v.*

---

[6] An amended version of 18 U.S.C § 2339B took effect on June 2, 2015, increasing the maximum term of imprisonment for providing material support or resources when death does not result from fifteen to twenty years.

*Burgos*, 94 F.3d 849, 857 (4th Cir. 1996). In order to prove that a defendant knowingly and voluntarily joined the conspiracy, the United States must prove that the substance of their agreement contemplated conduct that satisfied the elements of a substantive offense under Section 2339B.

In order to convict each Defendant of the substantive offense of providing material support or resources to an FTO in violation of Section 2339B, as alleged in Counts Two through Twenty-One, the government must prove beyond a reasonable doubt the following elements: (1) the defendant provided or attempted to provide assistance that constituted "material support or resources"; (2) the material support or resources were provided or attempted to be provided to a Foreign Terrorist Organization ("FTO"), as defined in 8 U.S.C. § 1189,[7] or to an organization that "has engaged or engages in terrorist activity, or . . . in terrorism"; (3) the defendant acted knowingly and intentionally; and (4) the defendant had "knowledge that the organization is a designated terrorist organization, has engaged or engages in terrorist activity, or has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). A person "provides" material support or resources "to" a FTO if that person delivers material support or resources intended for an FTO, either directly or through conduits, to someone who is deemed a part of the FTO.

The Court has jurisdiction as to each count with respect to each Defendant if, among other grounds, she is a national of the United States, she is an alien lawfully admitted for permanent residence in the United States, the offense occurs in whole or in part within the United States, or the offense occurs in or affects interstate or foreign commerce. 18 U.S.C. § 2339B(d).

---

[7] "The Secretary is authorized to designate an organization as a foreign terrorist organization in accordance with this subsection if the Secretary finds that—(A) the organization is a foreign organization; (B) the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title or terrorism (as defined in section 2656f(d)(2) of title 22), or retains the capability and intent to engage in terrorist activity or terrorism); and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1). This designation is subject to judicial review.

## II. FINDINGS OF FACT and ANALYSIS OF THE EVIDENCE

The case involves inherently difficult issues of proof because of the secretive and amorphous nature of terrorist organizations, the limited transparency concerning the specific roles and associations of particular persons, and the limited practical ability to trace the extraterritorial movement of specific funds for specific purposes. Here, there is substantial direct evidence, principally in the form of recorded chatroom statements by Defendants and others. But the probative value of that evidence is limited and has to be considered with other circumstantial evidence, including the timing of the alleged transfers relative to actual events involving AS and the reasonable inferences that can be drawn from that evidence. The Court must also consider expert testimony concerning the nature of AS's operations, its known leadership, and those who are associated with its operations. Based on all of the evidence and the Court's assessment of the credibility of the witnesses and the weight to be given any particular piece of evidence, together with reasonable inferences drawn from that evidence, the Court makes the following findings of fact:

1. AS was designated as a foreign terrorist organization by the United States Department of State under Section 219 of the Immigration and Nationality Act and is also an organization that both had engaged and was engaging in terrorist activities at the time of the events involved in this case and therefore was then and remains today an FTO for the purposes of Section 2339B(a)(1).

2. Defendants are both United States citizens and residents of the United States who were born in Somalia.[8]  At all material times, both were ardent, committed, and active supporters of AS who knew and associated with persons who were themselves part of AS. At all material

---

[8] When the Court uses the term "Somalia" throughout this opinion, it refers to the territory that encompasses, among other parts, the self-declared state of Somaliland. The United States does not officially recognize Somaliland but rather considers it an autonomous region of Somalia. Hargeisa, Somalia is located within Somaliland.

times, they also knew that AS was a designated FTO, that it had engaged and was engaging in terrorist activities, and that it was unlawful to provide certain kinds of support to that organization.

3.  Beginning no later than April 2011, in the case of Defendant Jama, and April 2012, in the case of Defendant Dhirane, these Defendants participated in a chatroom known as ISDAC or "Dacwatu al-Tawhid." The chatroom was composed of members of the Somali community in the United States and around the world, commonly referred to as the Somali diaspora. The participants discussed current events concerning Somalia and also the activities of AS as they appeared in the worldwide press. Also, on various occasions, AS leaders and representatives would speak to the group and solicit various forms of support, including financial support.

4.  Within a smaller private chatroom hosted by Paltalk, a subgroup of participants known as the "Group of Fifteen" held separate and more confidential discussions approximately once or twice per month. Only those participants from the larger chatroom who had been or could potentially be persuaded to become committed supporters of AS were invited into the Group of Fifteen. Both of these Defendants were members of the Group of Fifteen, which was committed to providing financial contributions approximately monthly for the benefit of AS. This money was delivered to persons involved in AS's operations either on what was referred to as the "Nairobi side" (referring to an area in and around Nairobi, Kenya) or the "Hargeisa side" (referring to an area in and around Hargeisa, Somalia). The chatroom itself was sponsored, supported, and financed through persons closely linked to AS and its fundraising efforts.

5.  Both Defendants also played prominent, if not leadership, roles within the Group of Fifteen. One or both of these Defendants were involved in arranging for representatives or persons

associated with AS to speak to both the chatroom and the Group of Fifteen, during which time these AS members solicited support, including financial resources. Defendant Jama would then transmit the funds or cause the funds to be transmitted by people such as her husband, Ali B. Sheikh, to various other individuals more directly connected to AS.

6. Defendant Jama supervised the monthly payments by the Group of Fifteen members.[9] Occasionally, she personally solicited contributions. She also monitored whether the individual members had satisfied their monthly commitments and whether those sums had been successfully transmitted to and received by AS contacts on both the Nairobi side and the Hargeisa side, and she served in the nature of an enforcer by following up with those members of the Group of Fifteen who had not paid their monthly commitments on time. Jama also instructed Dhirane on how to perform these roles, and Dhirane came to play a similar role as Jama within the Group of Fifteen.

7. As part of their activities within the Group of Fifteen and before they became part of that group, Defendants associated and coordinated with other supporters of AS, including Codefendant Mohamed, located in Nairobi, Kenya, and Codefendant Abdullahi, located in Hargeisa, Somalia. All of these other individuals were actively involved in arranging for and facilitating support for AS. Both Mohamed and Abdullahi had access to AS leadership and coordinated their own activities in light of the specific needs of AS as events unfolded as a result of AS military operations.

8. Mohamed operated two safe houses in Nairobi, Kenya for AS. One of these was focused, at least in part, on providing medical care and treatment to injured AS soldiers. The other one

---

[9] Defendants argue that their use of the term "living expenses," which they frequently used in reference to the monthly payments, was code for only medicine or medical services and that they intended only that medical-related services be provided to AS with the funds that were provided through the chatroom. The Court finds that the use of that term, particularly with respect to support on the Hargeisa side, was not so limited in its meaning. Rather, it was used more broadly to refer to general transfers of funds or support to AS.

was used as a staging ground in various respects for AS military operations. Mohamed coordinated her work at the two safe houses with the specific needs of AS for years, and there is no evidence that she worked for, with, or on behalf of any individual or entity other than AS.

9. Abdullahi was involved in receiving money for AS in Somalia for such purposes as providing transportation, trucks, and other supportive services to AS. This support included what were referred to in the Group of Fifteen chatroom as "living expenses" in the coded language that the Defendants and others employed to conceal the true nature of their discussions. There is no evidence that she worked for, with, or on behalf of any individual or entity other than AS.

10. Jama and Dhirane were involved in generating and delivering funds for the benefit of AS, through the transmission of those funds to these other individuals such as Mohamed and Abdullahi. Jama principally focused on the delivery of funds to Mohamed and others on the Nairobi side, and Dhirane principally focused on the delivery of funds to Abdullahi on the Hargeisa side. Often, both Defendants knew that various intermediaries were being used as conduits in order to conceal the sources and purposes of those funds. These intermediates included Osman Jama, Defendant Jama's father, and Ali B. Sheik, Jama's husband, among others.

11. As part of their fundraising activities, Defendants had access to leaders within AS and, through those contacts, had access to non-public information pertaining to AS's financial needs as well as other activities with which it was involved, including military activities. They also coordinated to some degree their fundraising with the specific needs of AS.

12. The Court has jurisdiction over both Defendant Jama and Defendant Dhirane with respect to each of the Counts of the indictment.

13. With respect to Count One: Conspiracy to Provide Material Support to a Foreign Terrorist Organization, the United States has proven beyond a reasonable doubt that Defendants Jama and Dhirane each knowingly and intentionally entered into an agreement between themselves and others to provide material support or resources to AS, which they knew was an FTO, in violation of Section 2339B. The Court therefore finds both of the Defendants guilty of conspiracy as charged in Count One.

### A.    Whether Defendants or Their Codefendants Were Part of al-Shabaab

The defendants, through counsel, concede they were involved in providing funds to particular people in order to assist AS in certain limited ways. The central factual and legal issue with respect to Count One is whether the substance of Defendants' agreement to provide those funds had as its objective providing unlawful material support and resources to an FTO in violation of Section 2339B. Dispositive of that issue is whether these Defendants thought and intended as part of their agreement that the funds that would be delivered to certain individuals would be funds delivered to AS or to individuals who acted as conduits for the delivery of these funds or other unlawful material support to AS. For the purposes of Count One, it is immaterial whether defendants were, in fact, successful in doing so.

While not disputing that they intended to provide certain assistance that would benefit AS, Defendants contend that the substance of their agreement was simply to provide funds to persons who supported, but were independent of, AS, who, in turn, would provide exempted medical assistance to AS. Similarly, Defendants contend that their fundraising activities and their transmission of the alleged funds were done through persons they believed to be entirely

independent of AS and for purposes the Defendants believed were lawful. In this regard, Defendants contend that what they intended to provide, and what they did in fact provide with the funds they sent to persons independent of AS, was "medicine" or other lawful assistance to AS as well as to those not part of AS such as orphans. In support of that position, Defendants argue that the term "medicine" is required to be defined broadly both as a matter of statutory construction within the overall context of Section 2339B and related statutes and also in order to be consistent with customary international law and the United States' treaty obligations. By way of summary, Defendants argue, based on these contentions, that the money they agreed to provide was not material support or resources because (1) they did not intend to deliver these funds to AS or anyone who could be considered part of AS; and (2) they intended and expected that the persons who they agreed would receive the funds would use the funds only to provide to AS exempted medicine or other medical-related care that should be considered within the scope of the exemption for "medicine" under the definition of "material support or resources."

There is surprisingly little case law concerning by what standard to determine whether a particular individual is sufficiently associated with an FTO to constitute the organization itself. It appears that no decision of the Supreme Court, Fourth Circuit, or any other circuit court has addressed explicitly what showing is legally adequate to constitute delivery of funds or other material support to an FTO under Section 2339B. In *United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015), the Eighth Circuit considered facts very similar to those in this case involving fundraising for al-Shabaab through Internet chatrooms, but the court did not consider specifically whether the persons to whom the defendants delivered their funds were part of AS, as that issue was not raised on appeal. The Eighth Circuit therefore

had no occasion to articulate a specific legal test. Likewise, in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court considered various constitutional challenges to certain aspects of Section 2339B, principally under the First Amendment, as did the Fourth Circuit in *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) with respect to related sections. However, neither court specifically considered what involvement or association a person must have with an FTO to be deemed part of that organization for the purposes of Section 2339B.

Defendants argue for a test that requires that a particular individual operates under what they call the "command and control" of recognized AS leadership before that individual may be deemed a part of AS for the purposes of the material support statute. In support of that position, Defendants rely on cases that consider who should be deemed an enemy combatant or a non-privileged belligerent. They also contend that only someone who is judged a "member" of AS, as opposed to a "supporter," "financier," or "facilitator," should be considered part of the organization. In support of that position, they point to the matrix of designations used by the United Nations, as referenced in expert testimony presented by the United States, which distinguishes between a "member" of an FTO and a "supporter," "financier," or "facilitator."[10] Defendants claim that, while an FTO is not comparable to a formally organized corporation or other legal or lawful entity, it does have an identifiable structure with identifiable leaders and persons who are under the command and control of that leadership and for that reason, is fundamentally different from other types of domestic criminal organizations. Defendants also contend that any working definition of who is a part of an FTO must accommodate the First Amendment rights of advocacy and association,

---

[10] Regardless of the designation, however, persons in all designations are subject to sanctions under the UN framework.

including First Amendment protections that extend to the expressive conduct imbedded in financial donations, as recognized in such cases as *Buckley v. Valeo*, 424 U.S. 1 (1976). They claim that, for that reason, an essential element of the conspiracy claim must be a non-speech protected overt act in furtherance of the conspiracy.

The government proposes a much less formal test, akin to that used to determine whether someone is part of a criminal enterprise under the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, or other federal statutes. *See, e.g.*, 18 U.S.C. § 1961(4) (An "enterprise" includes any individual . . . or group of individuals associated in fact although not a legal entity.").

Although the material support statute does not specifically define or address who is part of an FTO, it does have other terms that are either defined or have been construed in ways that are useful in fashioning a test to determine whether someone is sufficiently acting for or on behalf of an FTO to be deemed a part of the FTO. For example, Section 2339B(h) explains that providing prohibited "personnel" involves providing a physical person, which may include himself or herself, who "work[s] under that terrorist organization's direction or control or . . . organize[s], manage[s], supervise[s], or otherwise direct[s] the operation of that organization." That subsection further provides that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction or control." On the one hand, Congress plainly intended for courts to consider the nature of an individual's actions broadly in relation to the overall goals of the terrorist organization in determining whether someone is to be deemed part of that organization. On the other hand, Congress also clearly envisioned that courts would not apply the material support statute to

those engaged merely in independent advocacy or only isolated, marginal, or tangentially related activities relative to the FTO. The Supreme Court has emphasized that because the statute requires that the "service" or other prohibited support be "to" an FTO, there must be a sufficient connection between the service provided and an FTO. *Humanitarian Law Project*, 561 U.S. at 23-24. But the specific *exclusion* in the definition of "personnel" of individuals working "entirely independently" and the specific *inclusion* of individuals whose activities involve organizing, managing, or supervising various operations (as well as those who operate under the FTO's direction or control) make clear that Congress also did not intend to limit Section 2339B's application to situations where prohibited support is delivered to designated or recognized leaders or to those who operate under some identifiable command and control structure. Rather, Congress intended to reach all persons who act on behalf of an FTO to further its goals and objectives in significant ways. The United Nations' system of categorization of persons associated with an FTO is not inconsistent with Congress's overall intention.[11]

The Court concludes that, for the purposes of Section 2339B, a person is to be deemed part of an FTO if that person is engaged in significant activity on behalf of an FTO relative to that FTO's goals and objectives, a determination to be made on the basis of all of the facts and circumstances pertaining to an individual's relationship with an FTO. To determine whether and to what extent a particular individual is acting on behalf of an FTO, in this case al-Shabaab, the Court has considered the following non-exclusive (and somewhat overlapping) factors: (1) the nature of the assistance provided or received by the individual (whether lawful or unlawful) and how it benefitted the FTO or otherwise advanced its goals

---

[11] At trial, the government's expert testified only that being a "supporter," "financier," or "facilitator," did not, in and of itself, necessarily mean that someone was also a "member" of an FTO.

and objectives; (2) for what time period the support or resources were provided; (3) whether the individual undertakes his or her activities specifically and exclusively for the benefit of the FTO or whether the individual undertakes similar activities for other organizations or for the public at large; (4) the degree to which the individual's actions are directed by or coordinated with others associated with the FTO or any of its generally recognized representatives; (5) the nature and extent of the individual's contacts within the FTO or with others acting on behalf of the FTO, including access to the FTO's leadership and to non-public information pertaining to the FTO's activities; (6) whether the individual self-identifies with the FTO, represents himself or herself as being part of the FTO, or purports to act on behalf of the FTO; and (7) whether the individual is reliably identified as being part of an FTO by recognized international law enforcement or other organizations. Rarely would the evidence bear on all, or even most, of these factors. In some cases, there may be sufficient evidence in just one of these categories to demonstrate an adequate link between a person and an FTO so as to establish that the individual undertook significant activities on behalf of the organization and should therefore be deemed part of that organization.

Here, Defendants Jama and Dhirane, as well as Mohamed and Abdullahi, all engaged in a substantial amount of significant activities on behalf of and in coordination with the AS organization itself over an extended period of time. Mohamed operated two safe houses: one for injured AS soldiers and one that facilitated AS's military operations. There is no evidence that she devoted her efforts to any other entity or group or operated an independent organization like Doctors Without Borders or the International Red Cross, which have purposes, goals, and objectives that are not tied to any one particular beneficiary or ideology. The funds Mohamed solicited and received were specifically for AS and for no one else, and

she was operationally integrated into the AS organization and coordinated her own activities with AS's broader organizational goals over a period spanning multiple years. Likewise, Abdullahi obtained funds for the use of AS and solicited those funds for that purpose alone. Both Mohamed and Abdullahi had access to AS leadership and coordinated their own activities in light of the specific needs of AS, as events unfolded as a result of AS military operations, whether it be the purchase of an x-ray machine, the payment of rent on safe houses, the purchase of trucks, or payments for AS's other specific needs. Overall, Mohamed and Abdullahi undertook significant activities on behalf of AS so as to be appropriately considered part of AS for the purposes of the material support statute. The roles played by Mohamed and Abdullahi and their respective associations with AS were well known to Jama and Dhirane. For that reason, Defendants understood, intended, and planned that, when they provided money to these individuals or to those associated with either the Nairobi or the Hargeisa side, they provided money to AS.

Jama and Dhirane also played such central coordinating, facilitating, and supervisory roles with respect to the Group of Fifteen and the ISDAC chatroom that they were also operationally integrated into AS as part of its fundraising network. Therefore, they, too, were engaged in significant activities on behalf of AS and also constituted parts of AS for the purposes of the material support statute. Both kept books and records with respect to their AS fundraising, were actively involved in raising and transmitting the funds they raised, and maintained and promoted active relationships with not only Mohamed, Abdullahi, and others already described, but also with other known and recognized representatives and spokespersons for AS. In short, the Group of Fifteen itself was part and parcel of AS's fundraising network and was integrated organizationally into AS's structure as an FTO.

For the above reasons, as well as those placed on the record in open court, Defendants knowingly and willingly entered into an agreement to provide money to AS, which they knew was an FTO. It is therefore unnecessary for the Court to determine whether the assistance provided to AS fell within the "medicine" exemption.[12]

## B.      Whether a Non-Speech Protected Overt Act is Required

In rendering its verdict, the Court has considered Defendants' position that in light of the First Amendment issues that would otherwise exist, the United States must prove a non-speech protected overt act in furtherance of the conspiracy, even though the statute does not explicitly require such an overt act, and, therefore, such an act would not ordinarily be required. In *Humanitarian Law Project*, the Supreme Court made clear that independent advocacy is protected and cannot be the basis for a conviction under Section 2339B, but it also made clear that the statute punishes conduct, not speech. 561 U.S. at 25-26. There is no First Amendment restriction on considering speech to determine knowledge and intent with respect to the prohibited conduct. Likewise, and not withstanding any First Amendment protections for the expressive conduct imbedded in financial donations, "in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, § 2339B does not violate the freedom of speech." *Id.* at 39. Here, Defendants agreed to engage in prohibited conduct and are not being punished for their advocacy but rather for their actions. For all these reasons, Congress's prohibition of the particular forms of support that

---

[12] Although it is unnecessary for the Court to determine this issue, it observes that there is no evidence that the money transferred by Defendants or other members of the Group of Fifteen and actually provided to AS was used exclusively or primarily to purchase medicinal substances, as opposed to medical-related services or equipment, non-medical safe houses, or non-medical related living expenses and military support. Were it necessary for the Court to rule on the issue of what constitutes "medicine," the Court would adopt the position of the Second Circuit in *United States v. Farhane*, 634 F.3d 127, 142-43 (2d Cir. 2011) that the medicine exception is limited to providing a substance or preparation, as opposed to services within the science or art of medicine. The Court would also find nothing in any international treaty or other international obligations of the United States that would require for the purposes of the material support statute that the medicine exemption be construed broadly to include medical care or humanitarian aid generally.

Defendants agreed to provide does not violate any First Amendment rights, and there is no need to incorporate into a conspiracy charge under Section 2339B a non-speech protected overt act in order to avoid any infringement on constitutionally protected speech.[13]

14.    With respect to the substantive counts alleged in Counts Two through Twenty-One: Providing Material Support to A Foreign Terrorist Organization, the United States has proven beyond a reasonable doubt that defendant Jama knowingly and intentionally made or directed each of the specifically alleged transfers to AS in order to provide unlawful material support or resources to an FTO. Jama knew and intended that her payments to Mohamed as alleged in Counts Two, Three, Five, Seven, Eight, Nine, Twelve through Seventeen, Nineteen, and Twenty were all payments to AS, which she knew was an FTO. Likewise, Jama directed her husband, Ali B. Sheikh, to make the payments sent to Mohamed alleged in Counts Four, Six, Ten, and Eleven and knew and intended that those payments go to AS. Jama also knew and intended that her payments to her father, Osman Jama, as alleged in Counts Eighteen and Twenty-One were, at least in part, payments to AS. The Court therefore finds Jama guilty as charged in Counts Two through Twenty-One.

15.    The United States has also proven beyond a reasonable doubt that Dhirane is accountable for Jama's illegal payments to AS beginning in April 2012 under *Pinkerton* liability. The Court therefore finds Dhirane guilty as charged in Counts Sixteen through Twenty-One and not guilty as charged in Counts Two through Fifteen.

    Although the United States did not prove Dhirane personally transmitted any of the funds alleged in Counts Two through Twenty-One, it nevertheless seeks Dhirane's

---

[13] To the extent that an overt act in furtherance of the conspiracy is required, however, the Court finds that both Defendants, as well as others involved in the conspiracy, engaged in wide-ranging overt acts in furtherance of the conspiracy. These included, but were not limited to, the maintenance of books and records with respect to the prohibited agreement and the unlawful objective of the conspiracy, as well as the logistical support for and the overall supervision of the Group of Fifteen's fundraising efforts and the actual solicitation and transmission of funds intended for the benefit of AS.

conviction on those same counts based on *Pinkerton* liability. The *Pinkerton* liability

doctrine provides that "the overt act of one partner in crime is attributable to all." *Pinkerton*

*v. United States*, 328 U.S. 640, 647 (1946). In other words, "[t]he *Pinkerton* doctrine makes

a person liable for substantive offenses committed by a co-conspirator when their

commission is reasonably foreseeable and in furtherance of the conspiracy." *United States v.*

*Ashley*, 606 F.3d 135, 142-43 (4th Cir. 2010). Although each defendant must have some

knowledge of the conspiracy, each individual co-conspirator need not be aware of its full

scope in order to be deemed guilty for the acts of other members. *See, e.g., United States v.*

*Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993).

The United States has proven beyond a reasonable doubt that Dhirane knowingly and

intentionally joined the alleged conspiracy no later than April 2012, with knowledge of the

scope and nature of the conspiracy as well as that its purpose was unlawful. Jama's transfers

of funds to AS as alleged in Counts Sixteen through Twenty-One occurred after Dhirane

joined the conspiracy and were reasonably foreseeable and within the scope of the conspiracy

that she knowingly and willingly joined. The Court therefore finds Dhirane guilty of

providing material support in violation of Section 2339B, as charged in Counts Sixteen

through Twenty-One, under *Pinkerton* liability based on Jama's convictions on those same

counts.

## IV. DEFENDANTS' RULE 29 MOTION

At trial, the Court reserved decision on Jama's Rule 29 Motion for Judgment of

Acquittal, which she initially made after the close of the government's case in chief on July 14,

2016 [Doc. No. 232] and later renewed. On September 9, 2016, Dhirane moved to adopt and

join this motion and the memoranda in support filed by Jama. [Doc. No. 248.]  The Court

granted that motion in open court on October 25, 2016.

Federal Rule of Criminal Procedure 29 provides that, after the government closes its case

in chief, "the court on the defendant's motion must enter a judgment of acquittal of any offense

for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  In

considering a motion for judgment of acquittal pursuant to Rule 29, the dispositive inquiry is

whether "as a matter of law the government's evidence is sufficient 'to establish factual guilt' on

the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003)

(quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144 (1986)).  When reviewing the sufficiency of

the evidence, the Court "must consider circumstantial as well as direct evidence, and allow the

government the benefit of all reasonable inferences from the facts proven to those sought to be

established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).  Importantly, the

Court does not assess the credibility of witnesses and resolves direct contradictions in testimony

in the government's favor. *See, e.g., United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998);

*United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983).

Here, the evidence as it existed at the close of the government's case in chief was

sufficient to sustain convictions of Defendant Jama on each of the twenty-one counts.  The

evidence was also sufficient to sustain a conviction of Defendant Dhirane under *Pinkerton*

liability on Counts One and Counts Sixteen through Twenty-One but not on Counts Two through

Fifteen since the evidence regarding Dhirane sufficiently establishes that she knowingly joined

the alleged conspiracy only as of April 2012.  For these reasons, Jama's Rule 29 Motion is

denied, and Dhirane's Rule 29 Motion is denied as to Counts One and Sixteen through Twenty-

One and granted as to Counts Two through Fifteen.

## V. CONCLUSION

For the reasons set forth above, the Court finds Defendant Jama GUILTY as charged in Counts One through Twenty-One and Defendant Dhirane GUILTY as charged in Counts One and Sixteen through Twenty-One and NOT GUILTY as charged in Counts Two through Fifteen. The Court also OVERRULES Defendant Jama's evidentiary objections [Doc. No. 233], DENIES Defendant Jama's Rule 29 Motion for Judgment of Acquittal [Doc. No. 232], DENIES Defendant Dhirane's Rule 29 Motion as to Counts One and Sixteen through Twenty-One, and GRANTS Defendant Dhirane's Rule 29 Motion as to Counts Two through Fifteen [Doc. No. 232]. The United States' "Motion for a Verdict Before Ruling on Defendants' Untested Legal Theories in Their Closing Arguments or on Defendants' Rule 29 Motion Based Upon the Geneva Conventions" [Doc. No. 258] is DENIED as moot.

The Clerk is directed to forward copies of this Memorandum Opinion and Findings of Fact in Support of Verdict to all counsel of record.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
November 4, 2016

21