IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:14CR230 |
| | ) | Hon. Anthony J. Trenga |
| MUNA OSMAN JAMA, | ) | Court Date: February 24, 2017 |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POSITION ON SENTENCING FACTORS**

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure and this Court's Policy Regarding Procedures to be Followed in Guideline Sentencing, the defendant, Muna Osman Jama, through counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR") prepared in this case and submits the following corrections, objections and argument.

**OBJECTIONS TO THE GUIDELINES CALCULATIONS**

*Misapplication of USSG § 3B1.1(b).*

As she does not meet the definition of a manager, Ms. Jama should not be assigned a 3-level increase of her base offense level. Section 3B1.1 of the U.S. Sentencing Guidelines provides for a 3-level increase in the offense level for a defendant who is a "manager or supervisor (but not an organizer or a leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. §3B1.1(b). "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." 3B1.1 app. n.2. In other words, the defendant must "control another criminal participant" to receive this enhancement. *United States v. Dukes*, 242 Fed.

Appx. 37, 53 (4th Cir. 2007).  "Section 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures."  *United States v. Litchfield*, 959 F.2d 1514, 1523 (10th Cir. 1992); *accord United States v. Sayles*, 296 F.3d 219, 225-27 (4th Cir. 2002) ("district court clearly erred" in imposing role enhancement on drug distributor where evidence established no "exercise [of] decision making authority" over other participants); *United States v. Bartley*, 230 F.3d 667, 673 (4th Cir. 2000) (to merit role enhancement, defendant must have "controlled the activities of other participants"); *see also United States v. Martinez*, 584 F.3d 1022, 1026-29 (11th Cir. 2009) ("district court clearly erred in imposing a role enhancement" where defendant "orchestrated drug shipments," and "utilized other individuals to mail and receive drug shipments," because defendant did not "exercise[] decision-making authority" over other participants); *United States v. Carter*, 449 F.3d 1287, 1299 (D.C. Cir. 2006) (district court clearly erred in imposing role enhancement in drug case based on findings that defendant was "'a point of contact' for heroin for several people and that [he] had 'persons delegated to him,' not that [he] exercised authority over others or was 'hierarchically superior' to them") *United States v. Quigley*, 373 F.3d 133, 139 (D.C. Cir. 2004) (reversing role enhancement despite recruitment and training of other participants because "the concept of 'control' or 'authority' [is] implicit in the notion of 'management' or 'supervision,' [and] connote[s] some sort of hierarchical relationship").  In other words, isolated instances of receiving assistance from others in the commission of the offense, in the absence of hierarchical organization, do not merit a role enhancement.

In this case, Ms. Jama solicited funds and sent them overseas, but there is no evidence that Ms. Jama ever exercised any control or authority over the other participants in a hierarchical

2

relationship, as is required to support the enhancement.  Indeed, the government's charges arise from evidence that Ms. Jama and other women in various places around the world communicated via an internet chat room and collected money.  While Ms. Jama may have been an important part of the charged scheme, the evidence did not establish the existence of a criminal gang with an organizational structure such that Ms. Jama exercised any degree of control over anyone else. Imposing an aggravating role here would simply confuse her solicitation of money with the control of other participants required to impose the enhancement.  See *Litchfield*, 959 F.2d at 1523.  As such, the enhancement is inapplicable to her. Accordingly, it is inappropriate to give a 3-level enhancement for a management or supervisory role and Ms. Jama should properly have an adjusted offense level of 40.

*Misapplication of USSG §2M5.3(b)(1)(c).*

Section 2M5.3(b)(1)(C) of the Sentencing Guidelines provides for a two-level enhancement if the offense involved "funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act."  This enhancement mirrors 18 U.S.C. § 2339A, which prohibits the provision of material support to anyone "knowing or intending" that the support be used in preparation for or in carrying out specific terrorist offenses.  18 U.S.C. § 2339A.  The enhancement only applies, however, if the defendants intend or know that the specific funds they sent "are to be used in the commission of a violent act."  § 2M5.3(b)(1)(C).  That is not the case here.

Indeed, the government charged Ms. Jama with violating § 2339B, not § 2339A, and thus secured convictions on the theory that any material support, regardless of whether it promoted a violent purpose, constituted a violation of the statute because "[s]uch support frees up other

resources within the organization that may be put to violent ends." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).  Furthermore, its central claim has been that Ms. Jama collected and sent money to purchase an X-ray machine and provide medical care for wounded al-Shabaab soldiers.  Such support may constitute a violation of § 2339B, but it does not warrant an enhancement under § 2M5.3(b)(1)(C).

The government's speculation that the small amounts of money sent by Ms. Jama were intended for other purposes simply fails to meet the preponderance of evidence standard required to impose a sentencing enhancement.  *See United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013) ("The burden is on the government to prove by a preponderance of the evidence that the sentencing enhancement should be applied.").  Moreover, regardless of al-Shabaab's history of engaging in violence, the enhancement should not be applied given the absence of evidence that the specific support sent was intended to be used to commit a violent act.  Accordingly, the Court should sustain the objection to this enhancement.

## SENTENCING ARGUMENT

### I.  The 18 U.S.C. § 3553(a) Sentencing Factors.

The Supreme Court in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *Gall v. United States*, 128 S. Ct. 586 (2007), established that the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations spelled out in 18 U.S.C. § 3553(a).  In two summary reversals, moreover, the Court expressed in no uncertain terms that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 555 U.S. 350, 129 S. Ct. 890 (2009); *Spears v. United States*, 555 U.S. 261, 129 S. Ct.

4

840 (2009).

While sentencing courts are to *consider* the sentencing Guidelines, Congress has *required* federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in paragraph 2 of § 3553(a) of Title 18.  Those factors include (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the Guideline range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. § 3553(a).

The overriding principle and basic mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary,*" to comply with the four purposes of sentencing set forth in Section 3553(a)(2): retribution (to reflect the seriousness of the offense, to promote respect for the law, and to provide "just punishment"), deterrence, incapacitation ("to protect the public from further crimes"), and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").  The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony provision."  This requirement is not just another factor to be considered along with the others set forth in Section 3553(a); rather it sets an independent limit on the sentence.

5

**II.  In consideration of all the § 3553(a) factors, a sentence of 60 months is appropriate.**

As portions of her argument should properly be filed under seal, Ms. Jama hereby presents a redacted version of her Position on Sentencing.  A complete version will be filed under seal in her Unredacted Position on Sentencing.  Any documents which should properly be under seal will be attached to Ms. Jama's Unredacted Position on Sentencing.

**A.  A sentence of 60 months of imprisonment is appropriate, given Ms. Jama's traumatic experiences, both as a child and as an adult.**

Ms. Jama's life has been indelibly marked by the trauma and atrocities that occurred in the Somali Civil War, which erupted when she was a 10-year old girl.  Ms. Jama was born in Mogadishu, Somalia, in 1980 and, along with her older half-brother, was raised primarily by her mother while her father worked in the United Arab Emirates.  As a young child, she only saw her father every few months for short visits.  PSR ¶¶ 67-68.  Her father remained in the UAE until after Ms. Jama left Somalia and he passed away in 2013.  See Report of Brandie Bartlett, Docket No. 291 at 8.

In 1991, when Ms. Jama was in fifth grade and attending a religious school class on a Sunday, gunfire and rocket-launched grenades erupted outside her school grounds.  The teacher sent the children home, but those who returned the next day noticed a number of absent classmates either because they were victims of the fighting or because their families had fled the city.  That day, a rocket-propelled grenade hit the school and the teachers escorted the children to their homes in groups.  Ms. Jama's mother told her to start preparing to leave the city.  Her extended family set out to escape the city in a caravan that was escorted by men armed with machine guns.  The fighting was so pervasive and brutal that several family members, including

6

two uncles, a cousin and an aunt were injured or killed during the escape.  Amid the chaos, Ms.

Jama's brother was separated from the family and would not be reunited with them for two years.

PSR ¶ 69; Bartlett Report at 3.

The escape route proved to be dangerous and traumatizing.  Ms. Jama frequently saw

dead bodies on the side of the road and witnessed vehicles and people on fire, including pregnant

women.  PSR ¶ 70; Bartlett Report at 3.

After several months living on the road and camping in various towns, Ms. Jama's family

landed at a refugee camp in Mandera, Kenya.  Life at the camp became normalized enough that

Ms. Jama began attending school again.  However, after about two years, the camp was attacked

by the Kenyan military and Ms. Jama's family had to flee once again.  They found refuge seven

hundred miles away in a camp in Mombasa, Kenya.

While in Mombasa, Ms. Jama's mother left for a few months to care for her sick mother.

Only ten years old, Ms. Jama could not travel with her mother for fear of being raped or

murdered along the route.  The Mombasa refugee camp also came under attack by a tribe who set

fires and chased people with machetes.  Ms. Jama vividly recalls being scared to the point of

immobility, but a cousin was able to help her escape.  Eventually, they returned to the camp to

find neighbors burned alive.  PSR ¶ 73; Bartlett Report at 4.  Ms. Jama recounts two other

traumatic events that she is unable to forget.  In one refugee camp when she was 11 years old, she

was asked to watch someone else's children while their mother went to the store.  The

dehydrated and malnourished children were close to death and two perished under Ms. Jama's

watch.  To this day, she reports "[i]t never left my mind, not once."  Bartlett Report at 4.  In

another, equally traumatic situation, Ms. Jama assisted in a precarious child birth that resulted in

the death of the baby and the eventual death of the mother after she went to great lengths to try to help save her.  *Id*.

Ms. Jama describes her entire refugee experience as something she does not like to think about, much less talk about.  PSR ¶ 73.  But the trauma inflicted by the Somali Civil War is not the only atrocity Ms. Jama experienced as a young child.  ████████████████████

████████████ and has a scar on her face from being conscious during an attempt to singe her irritated tonsils with a burning implement.  PSR ¶¶ 82, 85.

After almost seven years of living in such unimaginable conditions, Ms. Jama was liberated from the refugee camp by United Nations forces and was sent to live in the United States.  In November 1997, she relocated to Louisiana for a little over a month before moving to Seattle, Washington.  PSR ¶ 74.  The transition to the U.S. was difficult for Ms. Jama – she did not know the language, did not have many social supports, and intrusive traumatic memories constantly flooded her mind.  ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████

████████████████████████████████

██

Ms. Jama's personal decline continued when she was involved in a serious car accident in September 2003.  She lost consciousness for at least 20 minutes and was subsequently diagnosed with mild traumatic brain injury and she experienced ongoing neck and back pain.  PSR ¶ 84.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████   At the time of the accident, Ms. Jama had been working as a machine operator, but she was unable to return to work due to the negative physical and cognitive effects from the accident.  PSR ¶ 93.  She was eventually able to return to community college, which she was also attending at the time of her accident, but her education was cut short by her marriage to her current husband and her relocation to Virginia with him in 2004.  PSR ¶¶ 78, 90; Bartlett Report at 8.

████████████████████████████████████████  or attended school since leaving Seattle 13 years ago.  She has had six additional children with her current husband and has dedicated her life to their development and education as a homemaker and homeschool teacher. PSR ¶¶ 78, 92.

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

9



**B.    A sentence of 60 months of imprisonment is appropriate, given the role traumatic events in Ms. Jama's upbringing and her position as a member of the diaspora had in prompting her to send money to Somalia.**

Muna Jama is a damaged young woman who experienced countless horrors during her time in Somalia.  From witnessing the onset of the civil war in Mogadishu to seeing the dead bodies of vulnerable women and children, to watching women and children pass away in front of her, Ms. Jama has lived through so many atrocities that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Bartlett Report at 10.  Furthermore, she is of a generation and a population that was primed to see al Shabaab as liberators of the Somali people.  She learned of the horrors on the ground through the Somali social networks, which spread news primarily through oral and social means; the same horrors that she observed as a child while fleeing the civil war and while in refugee camps.  Ms. Jama was also a member of the diaspora, a Somali who lives in the United States, which, somewhat counterintuitively means that she was more likely to support an organization that she viewed as helping to protect Somali citizens.

As evidenced at trial, Somalia was assaulted by Ethiopian troops in 2006.  7/11/16 Tr. at

44-45.  The Ethiopians committed countless horrific offenses against the Somali people, especially women and children, to include robbery, rape, attacking civilian areas and even murder.  *Id.*, See Statement of Roger Middleton at 36 (attached).  The Ethiopians were widely viewed by both those in Somalia and those in the diaspora as committing abuses against Somalis. R. Middleton Statement ¶ 37.  It was al Shabaab, and the Islamic Courts Union, that took up the fight against the Ethiopians in "a prolonged and violent conflict."  R. Middleton Statement ¶ 36.

> Now, in about 2006, the Somali government at that time, the Transitional Federal Government, invited in Ethiopian troops. I think there were 20,000 troops that came in to suppress any insurgency. Those troops killed Somali citizens. They raped civilians. They took over their farms. They took their food.  Basically, they were doing what the government had done.  And so al-Shabaab grew even stronger in about 2006-2007, and many of the people who were in the diaspora by that time saw al-Shabaab as the hope. They saw them as the hope to establish peace and order and the hope to establish a sharia government.

Testimony of Matthew Bryden, 7/11/16 Tr. at 44-45.

Somali citizens took pride in the fact that a Somali group was "holding their own" against the Ethiopians. R. Middleton Statement ¶ 38.  And indeed, al Shabaab is an organization with a sophisticated public relations effort and they were "successful at exploiting this perception and narrative to build an image of themselves as resistance fighters against the might of Ethiopia." *Id.* It was hardly, then, an unusual view to see al Shabaab as protecting the citizens of Somalia from terrible abuses at the hands of the Ethiopian invaders.

Furthermore, many in the diaspora were even more inclined to adopt this perspective, due to their distance from the conflict on the ground.  Because they are not in Somalia, seeing and suffering the impact of the instant fighting, expatriate Somalis are often inclined to take a hard-line approach to resolving conflict in their home country. R. Middleton ¶¶ 30-31.  Indeed,

11

members of the diaspora might well be more inclined to support armed conflict, as they do not have the in-person perspective that Somali resident does. R. Middleton ¶ 31.

There is a deep cultural commitment within the Somali diaspora to support those back home through remittances - funds sent back home to those who are less fortunate. 7/11/16 Tr. at 81, R. Middleton Statement ¶ 29.  Ms. Jama also participated in this practice.  Given the support amongst the Somali diaspora for al Shabaab's efforts against the invading Ethiopian forces, support amongst the diaspora for those aligned with al-Shabaab is understandable.  Such support is grounded in a basic desire to protect the country and support resistance against exterior forces.

This conduct thus stands in marked contrast to individuals convicted of providing material support who have been born and raised in the United States or other western countries, have suffered no such horrors in their life and have no ties to Somalia.  Those who come to provide support to al Shabaab through their community ties, their compelling life experiences and their tainted view of the situation in Somalia warrant drastically different treatment than those who board a plane motivated by their conversion to an extremist ideology.

The circumstances of the offense are drastically different than those in the case of a recruit, who travels to join or actively participates in a terrorist organization.  In such cases, an individual expresses, through his actions in attempting to join the DTO, his desire to participate in the activities of that organization.  While much has been made by the government of the statements of Ms. Jama and Ms. Dhirane, the fact remains that they are simply that: statements.  Ms. Jama has never committed any acts of violence in the United States, attempted to physically participate in acts of violence abroad or attempted to travel to a foreign country to actively participate with a DTO.  Providing support to a DTO is unlawful, regardless of the form of the

12

support.  There is a grave distinction, however, between those who would actively participate in committing acts of violence and those who provide support from thousands of miles away and, as the government points, hiding behind a computer. Gvmt. Sentencing Memorandum at 16. Indeed, the case before the Court is distinct, not only from those cases where the defendant wished to become an active participant in a DTO, but also from those cases where support is provided in the form of supplies to further acts of violence.  Although the government presented very little if any evidence as to how the money collected by Ms. Jama was actually used overseas, the government has alleged that she raised $5,000 for the purchase of an X-ray machine to treat wounded al Shabaab soldiers and that money was given to Fardowsa Jama Mohammed to pay rent for a safehouse and doctors to treat wounded soldiers.  To be sure, the Court ruled that medical devices and medical care constitute prohibited material support.  But providing medical devices and medical care is very different than providing weapons or personnel.  Accordingly, the government's central claims regarding the nature of Ms. Jama's conduct distinguish this case from most other material support cases.

The instant case is also distinct, even among cases where the sole means of material support is providing money to a DTO.  The government's evidence at trial showed money transfers by Ms. Jama, or at her behest, totaling $4,600.00. GEX 10.  Ms. Jama was not a significant fundraiser for al Shabaab.  She was a stay-at-home mother, who was vulnerable, given her background and her position as a member of the diaspora and, accordingly, wired very small amounts of money.

In sum, the instant case is distinct from other material support cases, due to Ms. Jama's experiences and the limited and purely financial support she provided and, therefore, these facts

weigh in favor of a modest sentence.

**C.     A sentence of 60 months of imprisonment is consistent with the Parsimony Clause and would constitute a just sentence, as the Guidelines fail to recommend a just sentence.**

As discussed above, the guidelines are improperly calculated at 3780 months.  Were they to be properly calculated, however, the guideline range would be 360 - 3780 months.  Such a sentence is clearly unreasonable and, indeed, drastically exceeds that which the government asks for.

First, the guidelines call for a greater period of incarceration than necessary because a criminal history category of VI substantially over-represents the seriousness of Ms. Jama's criminal history and the likelihood that she will commit other crimes.  "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. §4A1.3(b)(1).  Ms. Jama, as discussed below, has never been convicted of a criminal offense and would ordinarily be placed in Criminal History Category I.  USSC § 3A1.4(b), however, requires that her criminal history category "shall be Category VI."  In spite of this, this Court has found that a departure under §4A1.3 may still be granted, even if the defendant is otherwise subject to § 3A1.4.  *United States v. Benkahla*, 501 F. Supp. 2d 748, 758 (E.D. Va. 2007) (holding that the Court had discretion in a terrorism case to downwardly depart on the basis of criminal history by § 3A1.4).  Indeed, the Court found that such a basis to depart existed where the defendant had no criminal history whatsoever: "[f]or an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly

14

over-represents the seriousness of his criminal history." *Id*. at 759.  Here, Ms. Jama has no

criminal history whatsoever.  To apply the most serious criminal history category to a woman

who has committed no prior offenses clearly, as the *Benkahla* Court found, overstates the

seriousness of her criminal history.

Second, USSG § 3A1.4 (a) applies a 12-level enhancement to any case charged under 18

U.S.S.C. § 2339B.  Given the base offense level of 26, this results in an adjusted offense level of

38, even without any other enhancements.  The enhancement also calls for an automatic

adjustment to a criminal history category of VI, the most serious CH possible.  In short, any

defendant charged under this statute receives a guidelines sentencing recommendation of thirty

years to life imprisonment, assuming he exercises his Constitutional right to a trial.  Clearly it

cannot be the case that no defendant who is charged with material support under 18 U.S.C. §

2339B warrants a sentence below thirty years, but the guidelines would suggest this is the case.

Accordingly, the guideline is inherently flawed.  Indeed, the Court agreed in at least one other

material support case, stating that ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

In light of the mandatory and excessively high offense level and criminal history level mandated

by the enhancement, the guidelines fail to provide any reasonable guidance whatsoever in the

instant case.

**D.    A sentence of 60 months would avoid unwarranted sentencing disparities.**

While it is impossible to identify a case with identical facts and defendants, the Court can

15

gain perspective from similar cases, by taking note of the manner in which other defendants have been more or less culpable than Ms. Jama, as well as the nature and circumstances which prompted the conduct in the instant offense. That is, in each instance, there are mitigating and aggravating factors, including the current case. In this case, a sentence of 60 months is warranted, given the sentences in other cases.

*Amina Esse* (DMN, 0:14CR369)

As this Court is aware, Ms. Esse testified at the trial in the instant case that she sent money to al Shabaab. She was part of the same group of women as Ms. Jama and Ms. Dhirane and is the only other individual who has been brought before a court for the instant offenses. Her case, therefore, deserves significant consideration from the Court.

Ms. Esse has not yet been sentenced, however, the government has asked that she receive a sentence of probation. *United States v. Amina Esse*, 0:14CR369 (DMinn), Government's Position With Respect to Sentencing and Motion for Downward Departure at 1. To be sure, Ms. Esse was involved for a shorter period of time, sent a smaller amount of money, pleaded guilty, and cooperated with the government. Ms. Esse nevertheless engaged in the identical conduct that Ms. Jama is being sentenced for. That is, while Ms. Esse may have had a smaller role and may have decided to avail herself of the opportunity to cooperate, the seriousness of the offense - the harm of sending money to support al Shabaab - is identical. A sentence of 60 months, therefore, will not create unwarranted sentencing disparities. It accounts for the fact that the participation of the defendants in the instant case was more significant. Indeed, a sentence *above* 60 months would create unwarranted sentencing disparities, as it can hardly be just to say that a defendant's sentence should be increased by two decades for the same conduct, merely because

16

she did not choose to cooperate and her participation in the same conduct was by degrees more extensive.

*Nima Ali Yusuf* (SDCA, 3:10CR4551)

The government correctly states that the facts of Ms. Yusuf's case were substantially similar to the instant case. Government's Sentencing Memorandum at 22.  The government also correctly points out the distinction between their conduct: while the conduct in the instant case involved recruiting others to send money for safe house rent and property, Ms. Yusuf attempted to recruit an individual to travel to Somalia and join the ranks of al Shabaab.  Ms. Yusef's conduct clearly constitutes a more serious offense.  While it is true that Ms. Yusuf was younger than Ms. Jama at the time of her offense, in consideration of Ms. Jama's background and particular vulnerabilities to this conduct, it is not unreasonable that she should receive a lesser sentence for less culpable conduct.  Ms. Yusuf was sentenced to 96 months of imprisonment.

*Ali Shukri Amin* (EDVA, 1:15CR164)

Mr. Amin was sentenced in this District.  While he was a very accomplished and young man at the time of his offenses, Mr. Amin's conduct was far more severe than that in the instant case.  Mr. Amin was responsible for writing and distributing via Twitter an article about how jihadists could establish donation systems and Bitcoin to solicit funding, arguably prompting his 4,000 followers to contribute far more to a DTO than in the instant case.  But Mr. Amin was responsible for a far more serious offense: facilitating an 18-year old's travel to Syria to join ISIL (the "Islamic State in Iraq and the Levant").  Mr. Amin helped transport the individual to Dulles International Airport and advised him where to go to meet other ISIL recruits once he arrived in Turkey.  Mr. Amin was ultimately advised that the 18-year old did, in fact, arrive in Syria.  While

Mr. Amin suffered health and family issues, he was primarily raised in the United States and did not encounter any of the significant trauma that Ms. Jama witnessed.  Mr. Amin was sentenced to 136 months of imprisonment.

### E.    A sentence of 60 months of imprisonment will serve to deter Ms. Jama and others from committing this offense.

The government argues that Ms. Jama will not be deterred from future offenses, however, there is absolutely no way to predict this, given Ms. Jama's lack of any prior criminal history. She is not an individual who has repeatedly, or even once, been sentenced to a period of incarceration and shown herself to be undeterred.  There is every reason to believe that five years of separation from her seven children will be a heart-wrenching experience for Ms. Jama.  While the calls in the instant case may have revealed that Ms. Jama and Ms. Dhirane were aware of the statutory punishment, there is a drastic difference between knowing the sanction for the offense and living through it.  There is no basis to say that Ms. Jama cannot possibly be deterred and, indeed, courts have found otherwise.[1]

Furthermore, the government's arguments that a sentence of two decades is warranted because of the difficulty of prosecuting such cases is also without merit.  The government argues that, because individuals do not fear getting caught, a severe sentence is necessary for those who are, to tip the scales in the cost-benefit analysis.  This notion, however, is not borne out by research and is not subscribed to even by the research arm of the Department of Justice, the

---

[1]

    As the Second Circuit noted, a defendant who has not previously been sentenced to incarceration, or has been sentenced to minimal incarceration, might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by lengthy sentence.  See *United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir.2001).  Ms. Jama has never been convicted of any crime and has served any period of incarceration. PSR ¶¶ 58-60.

National Institute of Justice, which acknowledges that longer periods of incarceration do not result in increased deterrence.[2]

Finally, while general deterrence is a goal of sentencing, it cannot trump the requirement of individualized sentencing.  "[D]eterrence as a sentencing rationale is subject to limitation. Tailoring punishment to the individual criminal may reduce the efficacy of deterrence, but that reduction is an inevitable cost of a system that eschews mechanistic punishment.  General deterrence is a legitimate aim, but it has never been the sole aim in imposing sentence.  Central to our system of values and implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social policy, that human beings are to be treated not simply as means to a social end like deterrence, but also- and always-as ends in themselves." *United States v. Barker*, 771 F.2d 1362, 1368–69 (9th Cir. 1985).

## CONCLUSION

In sum, the appropriate sentence in this case would be a sentence of 60 months of imprisonment.  Such a sentence is warranted given: (1) Ms. Jama's history and characteristics, particularly her life experiences and situation, and (2) the degree to which her history and characteristics contributed to the conduct in this case.

Accordingly, for the reasons listed above, Ms. Jama respectfully asks the Court to impose a period of 60 months of imprisonment.  Ms. Jama would also respectfully ask this Court to

---

[2]

See USDOJ, National Institute of Justice, Five Things About Deterrence (July 2014) (https://www.ncjrs.gov/pdffiles1/nij/247350.pdf) ("Increasing the severity of punishment does little to deter crime.").  *See also Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment*,"V.Wright (Nov.2010) (http://www.asca.net/system/assets/attachments/1463/Deterrence_Briefing_.pdf?1290182850) (finding certainty of punishment produces a stronger deterrent effect than increasing severity).

recommend to the Bureau of Prisons that she be designated to a facility as close to the northern Virginia area as possible.

Respectfully submitted,
MUNA OSMAN JAMA
By Counsel,
Geremy C. Kamens,
Federal Public Defender

By: _____/s/_____
Geremy C. Kamens
Va. Bar #41596
Federal Public Defender
Whitney E.C. Minter
Va. Bar # 47193
Assistant Federal Public Defender
Attorneys for Muna Jama
1650 King Street, Suite 500
Alexandria, Virginia   22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 17, 2017, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

James Gillis, Esq.
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
james.p.gillis@usdoj.gov

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

By:   _____/s/_____
Whitney E.C. Minter
Va. Bar # 47193
Assistant Federal Public Defender
Attorney for Muna Jama
1650 King Street, Suite 500
Alexandria, Virginia  22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)